**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EDWARD PEOPLES,** | Civil Action No. 17-5460 (CCC) |
| Petitioner, | |
| v. | OPINION |
| **STEVEN JOHNSON, et al.,** | |
| Respondents. | |

**CECCHI, District Judge**:

Presently before the Court is the petition for a writ of habeas corpus of Edward Peoples ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court murder conviction. ECF No. 1. Respondents filed a response to the petition. ECF No. 9. Petitioner did not file a formal reply. For the following reasons, the Court will deny Petitioner's habeas petition and deny Petitioner a certificate of appealability.

**I. BACKGROUND**

The Superior Court, Appellate Division summarized the factual background of this matter as follows in its opinion affirming Petitioner's conviction:

> Following a jury trial, [Petitioner] was convicted of first-degree murder [in violation of N.J. Stat. Ann. §] 2C:11-3a(1) and (2) (count two); first-degree attempted murder [in violation of N.J. Stat. Ann. §] 2C:11-3 (count three); third-degree unlawful possession of a weapon [in violation of N.J. Stat. Ann. §] 2C:39-5b (count five); and second-degree possession of a weapon for an unlawful purpose [in violation of N.J. Stat. Ann. §] 2C:39-4a (count six)[.] At sentencing, the trial judge merged count six with count two and sentenced [Petitioner] on count two to a sixty-five year term of imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.

[Stat. Ann. §] 2C:43-7.2. The judge also imposed a concurrent twenty-year term of imprisonment with seventeen years of parole ineligibility on count three, a concurrent five-year term of imprisonment on count five; and the appropriate assessments and penalties.

. . . .

The charges against [Petitioner] stem from the shooting death of Rahman Jenkins (Jenkins) in the parking lot of the Baxter Terrace apartment complex in Newark (the apartment complex). Duane Tims (Tims) testified at trial that he and Jenkins were long-time friends who once sold drugs together. On January 20, 2006[,] at approximately 8:00 p.m., he and Jenkins drove in Tim's van to the apartment complex, and went to the apartment of Marvin Shahid McLeod (McLeod). They were there a few minutes when a man, who was "jittery" and very nervous, came into the apartment and said something to the three men that caused them to leave immediately.

Tims, Jenkins, and McLeod crossed the parking lot and headed for Tims's van. Tims was in the lead, while Jenkins and McLeod walked a few feet behind him. Neither Tims nor Jenkins was armed. Tims reached and entered the van first, started it, and then heard a gunshot from behind the van, followed by several more gunshots. He opened the passenger door to facilitate Jenkins's entry, but Jenkins did not appear. He then opened the driver's door, looked toward the rear of the van, and saw Jenkins laying face down in the parking lot, with two men standing over him. One of the men was tall and slim, and the other was shorter and chubby. The shorter, chubbier man was pointing and shooting his gun at Jenkins. The man turned, pointed and fired the gun at Tims, but missed. Tims quickly drove from the parking lot. He recognized the shorter, chubbier man who shot at him as "Phat Boy," whom he had known for about ten years. At trial, he identified [Petitioner] as "Phat Boy."

Tims decided to return to the parking lot. On the way back, he stopped and reported the shooting to two New Jersey Institute of Technology police officers, who immediately went to the apartment complex. Tims did not otherwise speak to the police about the shooting until March 15, 2006, when he was contacted as part of the official murder investigation.

McLeod testified at trial that as he was following Jenkins through the parking lot, two men ran up to them, he heard shots, saw Jenkins fall, and then turned and ran back to his apartment. Contrary

2

to Tims's description of the shooters, McLeod said they were both slender in build, though one was taller than the other. He also testified that he did not see [Petitioner] in the parking lot the night of the shooting.

Codefendant Joseph Richardson (Richardson)[, who agreed to testify as part of a plea agreement,] testified at trial that on the night of the shooting he was at his girlfriend's apartment in the apartment complex when [Petitioner], whose mother also had an apartment there, entered and told him Jenkins was outside. [Petitioner] asked Richardson to accompany him to speak with Jenkins. According to Richardson, [Petitioner] and Jenkins had an ongoing dispute over selling drugs at the apartment complex. Jenkins sold drugs from the parking lot until September 2005, when he was shot by Cory Hopkins[, who was incarcerated at the time of Jenkins's death]. Jenkins returned to the parking lot in mid-January 2006 to resume his drug selling; however, [Petitioner] and Richardson were now selling drugs there, and [Petitioner] told Jenkins that Jenkins could not do so. Matters came to a head when Jenkins returned on January 20, 2006.

Richardson also testified that he and [Petitioner] left Richardson's girlfriend's apartment and went to [Petitioner]'s mother's apartment, where they armed themselves with handguns; Richardson had a nine-millimeter handgun, while [Petitioner] had an "automatic" handgun. Richardson saw [Petitioner]'s girlfriend, Anyea Williams (Williams), in the apartment, but she did not speak to them.

Richardson and [Petitioner] left the apartment, walked to the parking lot, approached Jenkins, who was walking ahead of them toward a van that had its engine running. [Petitioner] called Jenkins, and Jenkins turned and said, "What's up?" The two men stood "a couple of steps" apart and talked for about a minute, with Richardson standing behind and very close to [Petitioner]. At that point, shots were exchanged. Richardson saw [Petitioner] shooting a black, semi-automatic handgun, and saw Jenkins fall to the ground. The gunfire continued, and Richardson began running backwards, shooting his handgun about nine times in the direction of Jenkins and the van. Initially, he did not know where the other gunshots were coming from, but concluded that they were from [Petitioner]'s handgun. He did not see Jenkins with a weapon, and did not see any gunfire coming from the van. Both he and [Petitioner] then fled the scene. Based on a conversation he had with [Petitioner] prior to his arrest, he believed that [Petitioner] was threatening to kill him if he testified against [Petitioner].

3

Williams was arrested on a drug charge on the evening of the shooting, and was released from jail three weeks later. She and [Petitioner] began having relationship problems, and she eventually filed a domestic violence complaint against him. She also gave the police a statement on February 28, 2006, inculpating [Petitioner] in Jenkins's murder. On July 17, 2006, she received a probationary sentence following her conviction on the drug charge in exchange for her agreement to testify against [Petitioner]. On September 25, 2007, Williams gave a videotaped statement describing threats she received about testifying against [Petitioner]. She had also received letters from [Petitioner] warning her against testifying against him.

Williams testified at trial that, between 8:00 p.m. and 8:30 p.m. on January 20, 2006, she was at [Petitioner]'s mother's apartment when [Petitioner] and Richardson entered. Richardson had a handgun in his waistband, and [Petitioner] went into the bedroom and retrieved a handgun that was kept there. The two men then left the apartment together and went to the parking lot. A short time later, she heard gunshots. [Petitioner] returned to the apartment and told her that he shot Jenkins after an argument "[o]ver a drug spot." [Petitioner] then left the apartment. At that point, an unknown person entered the apartment and told Williams to leave because the police were coming.

Marquis Grimsley (Grimsley) gave the police a statement on January 31, 2006, that he saw [Petitioner] standing over Jenkins and shooting him. He also gave a videotaped statement on September 20, 2007, that [Petitioner] made threats against him and his family if he testified against [Petitioner].

Grimsley had also received three letters from [Petitioner] prior to trial, two of which he discarded, but forwarded the third to another person. The third letter made its way to a detective. In that letter, [Petitioner] thanked Grimsley for saying he would not testify against [Petitioner]. [Petitioner] also asked Grimsley to complete a typewritten affidavit that accompanied the letter, which said that Grimsley had been untruthful in his January 31, 2006[,] statement, and that he had not seen [Petitioner] or anyone else shoot at Jenkins.

Contrary to his statements to the police, Grimsley testified at trial that at the time of the shooting, he was visiting his girlfriend's apartment when he looked out the kitchen window, heard gunshots, and then ducked below the window line, not observing the shooting. When he looked out the window again, he saw [Petitioner] running from the scene, but could not remember seeing anything in

4

[Petitioner]'s hands. He also testified that [Petitioner] made no threats against him about testifying at trial.

Gregory Smith (Smith) had been arrested on May 7, 2007, on aggravated assault and weapons charges, and was housed in jail with [Petitioner]. He later entered into a plea agreement to testify against [Petitioner] in exchange for a probationary sentence. Smith testified at trial that on May 11, 2007, [Petitioner] told Smith that he had shot Jenkins, but that he wanted Smith to testify that Smith was present at the shooting and saw a "skinny guy" shoot Jenkins. [Petitioner] also offered Smith $10,000.

Smith also testified that [Petitioner] gave him written instructions and a diagram of the parking lot so that Smith could tailor his testimony to the crime scene. The instructions directed Smith to say that he was visiting a friend at the apartment complex at 8:30 p.m., and that as he exited the building, he saw Richardson and his brother arguing with Jenkins and Tims, saw Richardson, Richardson's brother and Tims pull out handguns, and saw Richardson shoot Jenkins, probably with a .45 caliber handgun, while standing over Jenkins. The diagram specified where the shooting took place in the parking lot and the positions of the various actors. Smith gave the instructions and diagram to the prosecutor.

The medical examiner testified that Jenkins had been shot ten times at close range: there were five shots to the head, one to the neck, one to the chest, and three to the arms. A firearms expert examined the cartridge casings found at the crime scene, concluding that five were nine millimeter cartridges that had been discharged from the same weapon. The expert examined eleven other casings, concluding that they were from .45 caliber cartridges, and determined that four had been discharged from one weapon, while seven had been discharged from a different weapon. Based on the cartridges, the expert concluded that three different firearms were used during the shooting.

[Petitioner] did not testify at trial. Instead, he called McLeod and Lavar Gardner (Gardner). Gardner testified that she looked out a window after hearing the gunshots and saw a man lying on the ground in the parking lot, while a "skinny, very thin" man stood over him and shot him a number of times. She also saw a van driving away, with people in the van exchanging gunfire with people in the parking lot.

*State v. Peoples*, 2012 WL 1859191, at *1–4 (N.J. App. Div. May 23), *certif. denied*, 212 N.J. 462 (2012).

Prior to Petitioner's trial, Williams provided the Essex County Prosecutor's Office ("ECPO") with a letter that supported her assertions that Petitioner and his family had attempted to threaten and coerce her into refusing to testify against Petitioner. This letter tangentially mentioned Petitioner's counsel, Paul Bergrin, which led the State to file a motion to disqualify Bergrin based on conflict-of-interest grounds. Specifically:

> [t]he State argued that [Petitioner] advised Williams to evade the State's subpoena and not appear at trial at Bergrin's instruction, and thus, both [Petitioner] and Bergrin attempted to tamper with witnesses in violation of [N.J. Stat. Ann. §] 2C:28-5(a)(2) and (4), and Bergrin violated Rule of Professional Conduct 1.2(d). The State submitted a certification from Williams in support of the motion, which confirmed her receipt of the letter from [Petitioner] and also stated that [Petitioner] threatened her with physical harm if she testified against him. Williams did not say she had any contact with Bergrin or that Bergrin had any direct or indirect involvement with the letter or threats.
>
> [Petitioner] was assigned special counsel to represent him on the motion. Bergrin filed opposition, but the record does not reveal that [Petitioner] filed opposition. However, the record reveals that [Petitioner] advised the court he wanted Bergrin to continue representing him. The judge denied the motion, finding there was no evidence of an organized plan that directly connected Bergrin to instructing [Petitioner] to tamper with Williams, and [Petitioner] wanted Bergrin to continue representing him. The judge determined that [Petitioner] knowingly attempted to induce Williams not to testify by instructing her not to appear, thus denying the State evidence. Accordingly, the judge ruled the letter would be admissible at trial as evidence of [Petitioner]'s guilt.

*State v. Peoples*, 446 N.J. Super. 245, 249–50 (N.J. App. Div.), *certif. denied*, 228 N.J. 402 (2016).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute

that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and] . . . [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B. Analysis

1. Petitioner's evidentiary claims

In his first three claims, Petitioner attempts to challenge various evidentiary rulings of the state courts – the exclusion of the testimony of Brandon Stokes who would have testified to a hearsay statement made by Petitioner's co-defendant, the preclusion of Petitioner from questioning the police witnesses as to potential third-party guilt based on the bullet casings found at the scene of the shooting, and the admission into evidence of the videotaped statements of Williams and Grimsley. Because "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 (1983), claims challenging the evidentiary decisions of the state courts are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence."); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67–70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213–14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A habeas petitioner therefore generally only states a cognizable claim for habeas relief based on the admission or preclusion of evidence in state court by showing that the decision in question denied him Due Process under the Fourteenth Amendment and deprived him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate

8

'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation will only arise out of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994)).

Petitioner first takes issue with the decision of the state trial court to preclude Stokes from testifying that Richardson told him that Petitioner was not involved in the murder, and that Richardson and his brother had instead killed Jenkins. Petitioner contends that this hearsay statement should have been admitted. On direct appeal, Petitioner specifically contended that the statements should have been admitted as prior inconsistent statements of Richardson who had testified at trial. The Appellate Division rejected that argument as "Richardson never denied making any statements to Stokes," and there was therefore "no inconsistency in his testimony." *Peoples*, 2012 WL 1859191 at *12. Petitioner has presented no Supreme Court caselaw to the contrary, nor has Petitioner presented any Supreme Court caselaw which was misapplied by the Appellate Division. As it is clear that the exclusion of Stokes's testimony was neither an arbitrary decision, nor overly prejudicial in light of what Petitioner himself admits was "overwhelming evidence" of his guilt (*see* ECF No. 1 at 22), this evidentiary ruling was not so fundamentally unfair as to deny Petitioner Due Process, and Petitioner's claim therefore provides no basis for habeas relief.

Petitioner next contends that the state court erred by precluding him from pursuing the cross-examination of two police witnesses regarding the weapons used in the homicide. Specifically, Petitioner sought to elicit testimony from the police witnesses that one of the forty-five caliber handguns used in this matter may have been used in another shooting which took place after Petitioner was incarcerated, and to in turn use this testimony to argue a third-party guilt defense. The Appellate Division rejected this argument, finding that:

> [t]here is no evidence whatsoever of third-party guilt in this case. *See State v. Jimenez*, 175 N.J. 475, 486 (2003) (holding that "[t]here must . . . be some evidence of third-party guilt to permit the defense to argue the point"). [Petitioner's] claim of possible third-party guilt is nothing more than mere conjecture. *See State v. Cotto*, 182 N.J. 316, 333 (2005) (holding that a "defendant cannot simply seek to introduce evidence of 'some hostile event and leave its connection with the case to mere conjecture'" (quoting *State v. Sturdivant*, 31 N.J. 165, 179 (1959), *cert. denied*, 362 U.S. 956 [(1960)])). Accordingly, the judge properly precluded evidence of third-party guilt.

*Peoples*, 2012 WL 1859191 at *12. As noted by the Appellate Division, the record in this matter is devoid of any clear evidence suggesting third-party guilt. Petitioner's contention regarding third-party guilt rests entirely on the fact that one of the guns involved in this shooting *may* have been used in another crime at a later time. Petitioner's third-party guilt argument would therefore have been nothing more than mere speculation or conjecture, which is insufficient to support a third-party defense. Given the risk of confusion that could have arisen from the testimony Petitioner sought to elicit and the lack of probative value, the decision to preclude cross examination on this issue was not so arbitrary or prejudicial as to render Petitioner's trial fundamentally unfair, especially in light of the overwhelming evidence of guilt presented at trial. This claim is therefore insufficient to warrant habeas relief.

In his final evidentiary claim, Petitioner contends that the state court erred in permitting the videos containing the prior inconsistent statements of Williams and Grimsley into evidence, and in turn, into the jury room. These statements were admitted at trial after Williams denied the content of her recorded statements by testifying that she had not been threatened or warned not to testify and after Grimsley testified that his recorded statement was entirely false. The trial court therefore admitted the recorded statements as prior inconsistent statements after determining that the video recorded statements were sufficiently reliable. The Appellate Division upheld the admission of both statements as well as the admission of the entirety of Grimsley's statement. *Id.* at 8–11. In so doing, the Appellate Division determined that the factual and credibility findings of the trial court were well-supported and indicated that the recorded statements were sufficiently reliable to warrant admission as prior inconsistent statements. *Id.* at 9. The Appellate Division also upheld the finding that Petitioner had opened the door on cross examination, that Grimsley's recorded statement was not overly prejudicial as Grimsley had not implied that Petitioner himself was a member of a gang or criminal organization, and that the full video was not overly prejudicial. *Id.* at 10–11.

As with his other evidentiary claims, Petitioner fails to present any Supreme Court precedent contrary to the Appellate Division's decision, or which was unreasonably applied. Likewise, Petitioner has failed to show that the admission of these inconsistent statements, and in turn the admission of Grimsley's full statement once Petitioner opened the door, was so arbitrary, prejudicial, or unreasonable that the admission of the statements could have rendered his trial fundamentally unfair. Petitioner is therefore not entitled to habeas relief on any of his evidentiary claims.

Even had Petitioner been able to show that any of these evidentiary rulings were improper, he would still not have been entitled to habeas relief in light of the significant evidence against him. On collateral review, errors of constitutional dimension will be considered harmless "unless [the alleged errors] had a substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). The evidence in this matter included the testimony of numerous witnesses, including Petitioner's co-defendant, who testified that Petitioner had shot and killed the victim in this matter. Accompanied by the strong evidence that Petitioner was aware of his guilt, the above discussed evidentiary rulings could not have had a substantial and injurious effect or influence upon the outcome of Petitioner's trial.

## 2. Petitioner's Ineffective Assistance of Counsel claims

In his final claim, Petitioner contends that his trial counsel, Paul Bergrin, proved constitutionally ineffective. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness

> of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280–81 (D.N.J. 2015).

In his petition, Petitioner argues that his counsel advised Petitioner to reject a favorable plea deal and that counsel encouraged him to intimidate witnesses and attempt to secure perjured testimony from witnesses.

In order to prevail on a claim which was presented to the state courts on the merits, such as Petitioner's ineffective assistance of counsel claim, Petitioner must show that his post-conviction relief ("PCR") proceedings either "resulted in a decision that was contrary to, or involved an unreasonable application of" applicable Supreme Court precedent, or "resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)). Claims under the second prong of this test – the reasonableness of the factual determinations – are limited to the evidence presented to the state courts. *Id.* at 181–86. Furthermore, to prevail under the alternative first prong, a habeas petitioner must likewise show that the state courts unreasonably applied or reached a decision contrary to applicable Supreme Court precedent based solely on the state court record. *Id.* at 181–86. A district court may therefore only permit a habeas petitioner to expand the record either where the claim was not addressed on the merits in the state courts, but is ripe for habeas review, or where the petitioner has already established that the state courts unreasonably applied Supreme Court precedent and his claims have therefore become subject to *de novo* review in federal court. *Id.*; *see also Branch v. Sweeney*, 758 F.3d 226, 241–42 (3d Cir. 2014). Even in such rare circumstances, however, a habeas petitioner must still surmount § 2254(e)(2). That provision bars an evidentiary hearing and development of the record where "the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the petitioner's claim rests on a new rule of constitutional law which was previously unavailable, the factual predicate of the claim could not previously have been discovered through due diligence, or the facts underlying the claim would be sufficient to show by clear and convincing evidence that, but for the constitutional error, the petitioner could not have been found guilty.

      This Court will now address the merits of Petitioner's ineffective assistance of counsel claims. First, Petitioner asserts that he was denied the benefit of a 20-year sentence under an alleged proposed plea deal because Bergrin advised him to reject this deal. As the state court observed, however, there is no evidence that any such deal was ever offered to Petitioner. *See*

*Peoples*, 446 N.J. Super. at 255. Thus, Petitioner cannot show that he was prejudiced. *See, e.g., Lafler v. Cooper*, 566 U.S. 156, 163–64 (2012) (prejudice in plea context requires showing that a plea was offered and that the petitioner would have taken the plea given competent advice). Petitioner's plea-deal related claim is thus without merit.

In his chief claim, Petitioner argues that it was Bergrin who suggested that Petitioner engage in witness tampering, and that this poor advice led to evidence of his consciousness of guilt being admitted into evidence against him at trial. Petitioner also suggests that this advice to commit the crime of witness tampering also stemmed from or created a conflict of interest that prevented Bergrin from acting as his counsel. The Appellate Division acknowledged that Bergrin had been indicted and sentenced to life in prison. *Peoples*, 446 N.J. Super. at 255–259. Nevertheless, the court rejected Petitioner's ineffective assistance of counsel claims, specifically noting that Petitioner waived any conflict of interest by expressly choosing to have Bergrin continue to represent him, there was no competent evidence that Bergrin tampered with witnesses in this matter, and Petitioner's conduct in personally tampering with witnesses in his case made Bergrin's alleged wrongdoing insufficient to show ineffective assistance of counsel. The Appellate Division reasoned as follows:

> [The New Jersey] Supreme Court has "adhered to a two-tiered approach in analyzing whether a conflict of interest has deprived a defendant of his state constitutional right to the effective assistance of counsel." *State v. Cottle*, 194 N.J. 449, [467] (2008). "In those cases in which [the Court] has found a per se conflict, prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated. [*Id.*] However, the Court has limited findings of a conflict to cases in which an attorney is "contemporaneously under indictment in the same county as his client, and being prosecuted by the same prosecutor's office . . . absent a valid waiver by the client." *Id.* at 473.
>
> [Petitioner] waived any conflict of interest when he advised the court that he wanted Bergrin to continue representing him. In

15

addition, the ECPO investigation report reveals that [Petitioner] was the focus of witness tampering, not Bergrin, and none of the witnesses the ECPO interviewed implicated Bergrin in [Petitioner's] witness tampering scheme. Moreover, the State did not rely on the ECPO investigation to disqualify Bergrin, and there was never any determination that Bergrin was involved in [Petitioner's] witness tampering.

Insofar as [Petitioner] argues, as he did on direct appeal, that Bergrin's conflict of interest stemmed from his federal indictment, we reject that argument as well. A federal grand jury returned an indictment in November 2009, two years after [Petitioner]'s conviction. There was no evidence as to when federal authorities were investigating Bergrin and no evidence that the ECPO participated in that investigation. Unlike in *Cottle*[,] where the defense attorney "was under indictment and subject to prosecution during the entire period of his representation," 194 N.J. at 466[,] there was no evidence that Bergrin was contemporaneously under indictment at the same time as [Petitioner] and Bergrin was not being prosecuted by the same prosecutor's office. Accordingly there was no conflict of interest mandating reversal of [Petitioner]'s conviction.

. . . .

There is no doubt that [Petitioner] tampered with witnesses, but there is no competent evidence that Bergrin was directly or indirectly involved. Even if Bergrin was involved, [Petitioner] is not entitled to [ineffective assistance of counsel] relief when he participated in the illegal conduct or acquiesced in that conduct.

The notion that a defendant could successfully raise [ineffective assistance claims] when he engaged in illegal conduct in collusion with his attorney or acquiesced in the attorney's illegal conduct has not been squarely addressed by [New Jersey] courts. By way of analogy, [the New Jersey] Supreme Court has denied [ineffective assistance] relief to a defendant who claimed that but for trial counsel's deficient advice concerning sentencing consequences, and even though he was not guilty, he would have pled guilty rather than go to trial. *State v. Taccetta*, 200 N.J. 183, 192[] (2009). The Court noted that "an attorney would be engaged in professional misconduct if he or she knowingly assisted a client to perpetrate a fraud on the court by assisting or encouraging a client to lie under oath." *Id.* at 196[.] In denying . . . relief, the Court concluded [that a PCR court could not overturn a conviction resulting from a fair trial simply because a criminal defendant

asserts that he would have fraudulently pled guilty to an advantageous plea offer had he been allowed to lie to the court].

. . . .

Other jurisdictions have addressed the issue of a defendant engaging or acquiescing in illegal conduct and afforded the defendant no . . . relief. For example, in *Arnett v. State*, 938 P.2d 1079 (Alaska Ct. App. 1997), the defendant claimed that trial counsel rendered ineffective assistance by illegally advising him to abscond from trial and assisting him in absconding. *Id.* at 1082. The Court of Appeals of Alaska held the defendant was not entitled to [ineffective assistance] relief, reasoning [that] "[w]e have no doubt that a lawyer who counsels a client to commit a crime for tactical gain acts incompetently. But by the same token, this form of advice falls so far beyond the pale of anything that could conceivably be considered legitimate legal assistance that a defendant's voluntary reliance on it is tantamount to a willing abandonment of competent representation. A defendant who voluntarily commits a crime on advice of counsel ought not to be allowed to impute blame to the attorney or to claim prejudice stemming from the attorney's incompetence; for in almost all such cases, the defendant's own voluntary acts will be a superseding cause of any resulting misfortune." *Id.* at 1083.

The court concluded that, even assuming there was attorney-client collusion, "[t]o grant relief in this case would permit [the defendant] to reap a windfall new trial on account of his own [crime]. We cannot allow this tempting gambit for counsel and client. In [such circumstances, the defendant] must remain responsible for his own misconduct. [*Id.*]

In *DeHaven v. State*, 618 So.2d 337 (Fla. Dist. Ct. App. 1993), the defendant claimed that he presented differing versions of the victim's shooting to trial counsel and counsel said he preferred to use the version more favorable to the defendant. *Id.* at 339. The Florida District Court of Appeals stated that whether or not the defendant's [ineffective assistance] claim was true, [vacation of the defendant's conviction was not warranted where he had, at counsel's suggestion, "knowingly perpetrated a fraud upon the court." *Id.* at 339–40.]

In *Commonwealth v. McNeil*, . . . 487 A.2d 802, 807 (1985), the defendant claimed that trial counsel advised him to render perjured testimony. *Id.* at [806-07]. Finding the defendant freely and deliberately chose to offer false testimony, the Supreme Court

17

> of Pennsylvania held that . . . relief was not available to a defendant who "attempts to reap a windfall new trial on account of his own perjury." *Id.* at [807]. The court reasoned [that the "criminal justice system cannot and will not tolerate such an obvious and flagrant affront to the integrity of the truth determining process thinly disguised under the rubric of ineffective assistance." *Id.* at 807-08.]
>
> In *Kelley v. State*, 644 S.W.2d 671, 573 (Tex. Ct. App. 1982), defense counsel attempted to dispose of evidence. Though describing counsel's actions as "reprehensible," the Court of Appeals of Texas denied [ineffective assistance] relief to the defendant, finding that he acquiesced in the tactic. *Id.* at 574.
>
> Guided by the above principles, we hold that a defendant who participates in illegal conduct in collusion with his attorney or acquiesces in the attorney's illegal or unethical conduct is not entitled to [ineffective assistance] relief. We will not tolerate what amounts to a fraud on the court, and will not permit a defendant who participates or acquiesces in his attorney's illegal or unethical conduct to reap any benefit [therefrom]. To hold otherwise would impermissibly permit a defendant to build an [ineffective assistance] claim into his case, thus guaranteeing him a basis for reversal of an adverse verdict.

*Peoples*, 446 N.J. Super. at 255–59.

Turning first to the issue of the alleged conflict of interest, the Appellate Division's decision was neither contrary to nor an unreasonable application of applicable federal law. While the "Sixth Amendment guarantees a criminal defendant counsel's 'undivided loyalty free of conflict of interest,'" *see Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998) (quoting *Government of V.I. v. Zepp*, 748 F.2d 125 (3d Cir 1984)), a criminal defendant is free to voluntarily waive his right to "assistance of an attorney unhindered by a conflict of interests." *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5 (1978). Where a criminal defendant has "made a knowing and intelligent waiver" of his right to conflict-free counsel, he "cannot subsequently attack his conviction premised on the assertion of a conflict." *Rutherford v. Hendricks*, No. 02-3131, 2005 WL 1541063, at *14–15 (D.N.J. June 30, 2005); *see also United States v. Dolan*, 570 F.2d 1177,

1181 (3d Cir. 1978); *United States v. Krebs*, 788 F.2d 1166, 1173 (6th Cir. 1986); *United States v Sims*, 143 F. App'x 210, 217 (11th Cir. 2005); *Darby v. United States*, No. 10-1437, 2010 WL 4387511, at *8 (D.N.J. Oct. 28, 2010) (by "waiving his right to conflict-free representation, Petitioner also waived any ineffective assistance claims stemming from his attorney's conflict of interest [including any claim] that his attorney may [have been] too preoccupied with his own legal troubles to make himself available to Petitioner"). As Petitioner expressly and knowingly waived any conflict of interest, federal law does not permit him to now attack his conviction on that basis. Petitioner's conflict of interest claim is thus without merit.

Petitioner's final contention, that counsel proved ineffective by allegedly suggesting to Petitioner that he engage in witness tampering, fares no better. The state court in this matter held that a criminal defendant may not acquiesce to counsel's suggestion that he engage in obviously illegal activity and then attack his conviction on that basis. *See, e.g., Laskowski v. U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 330 (M.D. Pa. 2013). Indeed, the Appellate Division's decision affirming Petitioner's conviction has since been cited favorably throughout the country. *See State v. Barajas-Verduzco*, 198 Wash. App. 1072, at *6 (2017) (denying ineffective assistance of counsel claim based on defendant's culpable conduct and citing to *State v. Peoples* in support); *State v. Newton*, 230 Md. App. 241, 270, 146 A.3d 1204, 1221 (2016), *aff'd,* 455 Md. 341, 168 A.3d 1 (2017) (discussing cases in which courts have refused to countenance strategies creating a "heads-I-win, tails-you-lose situation"). Ultimately, courts are hesitant to find prejudice where a defendant attempts to create a "fool proof defense" by manipulating legitimate due process safeguards. *See Harding v. Lewis*, 834 F.2d 853, 859 (9th Cir. 1987) (refusing to presume *per se* prejudice where petitioner's attorney advised petitioner to represent himself to create fundamental error and petitioner was a "knowing and willing participant" in the scheme). Petitioner has

identified no Supreme Court caselaw to the contrary, nor any Supreme Court case unreasonably applied by the state court, and this Court is aware of no such caselaw. Petitioner has thus failed to demonstrate his entitlement to habeas relief, and his habeas petition must therefore be denied.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's claims are without merit for the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and he is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate Order follows.

**Date**: April 29, 2021

**Claire C. Cecchi, U.S.D.J.**